1
2
3                    UNITED STATES DISTRICT COURT
4                          DISTRICT OF NEVADA
5                               * * *
6    ROBERT W. ELLIOTT,                    Case No. 3:11-cv-00041-MMD-CLB
7                      Petitioner,                     ORDER
8         v.
     E.K. MCDANIEL, *et al.*,
9
                     Respondents.
10

11        Robert W. Elliott's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254
12   is before the Court for final adjudication on the merits of the remaining claims. (ECF No.
13   49.)[1] As discussed below, the Petition is denied.
14   **I.    BACKGROUND**
15        In September 2005, a jury convicted Elliott of two counts of robbery with use of a
16   deadly weapon in connection with a robbery at a Reno Dollar Tree store (Exhibits ("Exh.")
17   34, 35.)[2] The state district court sentenced him to two consecutive terms of 72 to 180
18   months, with two equal and consecutive terms for the deadly weapon enhancement. (Exh.
19   40.) Judgment of conviction was filed on October 25, 2005. (Exh. 41.)[3]
20        On direct appeal, Elliott raised two claims: (1) insufficient evidence was presented
21   to support his conviction for robbery with use of a deadly weapon; and (2) insufficient
22
23
24   _____
25        [1]Respondents filed a response (ECF No. 88) and Petitioner replied (ECF No. 89).

26        [2]Unless otherwise noted, exhibits referenced in this order are exhibits to
     Respondents' Motion (ECF No. 60) and are found at ECF Nos. 61-63. Exhibits to
27   Petitioner's amended petition (ECF No. 49) are found at ECF Nos. 50-53, and are referred
     to as Petitioner's exhibits ("Pet. Exh.").
28        [3]In another jury trial that overlapped with this case, Elliott was convicted of one
     count of robbery with an age enhancement and one count of robbery with use of a deadly
     weapon in connection with the robbery of a Smith's grocery store in Reno.

1   evidence was presented to establish that two acts of robbery occurred. (Exh. 53.) The

2   Nevada Supreme Court affirmed his convictions. (Exh. 55.)

3          On appeal from the denial of his state postconviction habeas petition, Elliott raised

4   two claims: (1) the State violated *Brady v. Maryland*[4] by failing to provide Elliott with the

5   investigative memorandum showing two potentially exculpatory witnesses and their

6   locations before the day of the evidentiary hearing; and (2) the state district court abused

7   its discretion when it denied a continuance of the evidentiary hearing when faced with the

8   State's potentially exculpatory investigative memorandum on the day of the evidentiary

9   hearing. (Exh. 94.) The Nevada Supreme Court affirmed the denial of the state

10  postconviction petition. (Exh. 99.)

11         Respondents have answered the remaining claims in Elliott's amended petition,

12  and Elliott replied. (ECF Nos. 78, 85.)

13  **II.     LEGAL STANDARDS**

14         **A.     The Antiterrorism and Effective Death Penalty Act (AEDPA)**

15         28 U.S.C. § 2254(d), a provision of the Antiterrorism and Effective Death Penalty

16  Act (AEDPA), provides the legal standards for this court's consideration of the petition in

17  this case:

18         An application for a writ of habeas corpus on behalf of a person in custody
       pursuant to the judgment of a State court shall not be granted with respect
19     to any claim that was adjudicated on the merits in State court proceedings
       unless the adjudication of the claim –
20
       (1)     resulted in a decision that was contrary to, or involved an
21     unreasonable application of, clearly established Federal law, as determined
       by the Supreme Court of the United States; or
22
       (2)     resulted in a decision that was based on an unreasonable
23     determination of the facts in light of the evidence presented in the State
       court proceeding.
24

25  The AEDPA "modified a federal habeas court's role in reviewing state prisoner

26  applications in order to prevent federal habeas 'retrials' and to ensure that state-court

27  convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685,

28  
       _____

       [4]373 U.S. 83 (1963).

       2

693-694 (2002). This court's ability to grant a writ is limited to cases where "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer*, 538 U.S. at 74 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell*, 535 U.S. at 694).

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Andrade*, 538 U.S. at 74 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (quoting *Williams*, 529 U.S. at 409).

In determining whether a state court decision is contrary to federal law, this Court looks to the state courts' last reasoned decision. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000). Moreover, "a determination of a factual issue made by a state court shall be presumed to

1   be correct," and the petitioner "shall have the burden of rebutting the presumption of

2   correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

3        **B.    Ineffective Assistance of Counsel**

4        Ineffective assistance of counsel ("IAC") claims are governed by the two-part test

5   announced in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme

6   Court held that a petitioner claiming ineffective assistance of counsel has the burden of

7   demonstrating that (1) the attorney made errors so serious that he or she was not

8   functioning as the "counsel" guaranteed by the Sixth Amendment, and (2) that the

9   deficient performance prejudiced the defense. *See Williams*, 529 U.S. at 390-91 (citing

10  *Strickland*, 466 U.S. at 687). To establish ineffectiveness, the defendant must show that

11  counsel's representation fell below an objective standard of reasonableness. *See id*. To

12  establish prejudice, the defendant must show that there is a reasonable probability that,

13  but for counsel's unprofessional errors, the result of the proceeding would have been

14  different. *See id*. A reasonable probability is "probability sufficient to undermine

15  confidence in the outcome." *Id*. Additionally, any review of the attorney's performance

16  must be "highly deferential" and must adopt counsel's perspective at the time of the

17  challenged conduct, in order to avoid the distorting effects of hindsight. *Strickland*, 466

18  U.S. at 689. It is the petitioner's burden to overcome the presumption that counsel's

19  actions might be considered sound trial strategy. *See id*.

20       Ineffective assistance of counsel under *Strickland* requires a showing of deficient

21  performance of counsel resulting in prejudice, "with performance being measured against

22  an objective standard of reasonableness, . . . under prevailing professional norms."

23  *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotations and citations omitted).

24  When the ineffective assistance of counsel claim is based on a challenge to a guilty plea,

25  the *Strickland* prejudice prong requires a petitioner to demonstrate "that there is a

26  reasonable probability that, but for counsel's errors, he would not have pleaded guilty and

27  would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

28  ///

1    If the state court has already rejected an ineffective assistance claim, a federal

2    habeas court may only grant relief if that decision was contrary to, or an unreasonable

3    application of, the *Strickland* standard. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003).

4    There is a strong presumption that counsel's conduct falls within the wide range of

5    reasonable professional assistance. *See id*.

6    The United States Supreme Court has described federal review of a state supreme

7    court's decision on a claim of ineffective assistance of counsel as "doubly deferential."

8    *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). The

9    Supreme Court emphasized that: "We take a 'highly deferential' look at counsel's

10   performance . . . through the 'deferential lens of § 2254(d).'" *Id*. at 1403 (internal citations

11   omitted). Moreover, federal habeas review of an ineffective assistance of counsel claim

12   is limited to the record before the state court that adjudicated the claim on the merits. *See*

13   *Cullen*, 563 U.S. at 181-84. The United States Supreme Court has specifically reaffirmed

14   the extensive deference owed to a state court's decision regarding claims of ineffective

15   assistance of counsel:

16       Establishing that a state court's application of *Strickland* was unreasonable
         under § 2254(d) is all the more difficult. The standards created by *Strickland*
17       and § 2254(d) are both "highly deferential," *id*. at 689, 104 S.Ct. 2052; *Lindh
         v. Murphy*, 521 U.S. 320, 333, n.7 (1997), and when the two apply in
18       tandem, review is "doubly" so, *Knowles*, 556 U.S. at ----, 129 S.Ct. at 1420.
         The *Strickland* standard is a general one, so the range of reasonable
19       applications is substantial. 556 U.S. at ----, 129 S.Ct. at 1420. Federal
         habeas courts must guard against the danger of equating
20       unreasonableness under *Strickland* with unreasonableness under §
         2254(d). When § 2254(d) applies, the question is whether there is any
21       reasonable argument that counsel satisfied *Strickland's* deferential
         standard.

22

23   *Harrington*, 562 U.S. at 105.

24   "A court considering a claim of ineffective assistance of counsel must apply a

25   'strong presumption' that counsel's representation was within the 'wide range' of

26   reasonable professional assistance." *Id*. at 104 (quoting *Strickland*, 466 U.S. at 689). "The

27   question is whether an attorney's representation amounted to incompetence under

28

5

1 prevailing professional norms, not whether it deviated from best practices or most

2 common custom." *Id.* (internal quotations and citations omitted).

3 **III.   TRIAL TESTIMONY**

4       Elliott's trial took place in front of state district Judge Charles M. McGhee. (Exhs.

5 29, 32.) Connie O'Sullivan, one of the two Dollar Tree employees present during the

6 robbery and an assistant manager, testified that at the end of her night shift on February

7 29, 2004, two men in black ski masks pushed their way into the store as the employees

8 were locking the door. (Exh. 29 at 15-28.) One man dragged O'Sullivan to the safe and

9 told her to hurry up and open it or he would stab her in the neck. She testified that she

10 never saw a knife though the man seemed to be holding something in his hand that

11 reflected light. She heard the second man ask, "do you think we need the gun or

12 anything," but she did not see a gun. The men left with over $5,000.

13       Patty Welch, a cashier, testified. (Exh. 29 pp. 28-43.) She said the two men came

14 up behind them and made them lie down on the floor. She also testified that one of the

15 men dragged O'Sullivan to the safe and that he seemed to be holding a knife because

16 she saw something reflecting light in his hand. Welch thought he was holding a knife with

17 a blade of about 4 or 5 inches, and she saw him holding it to O'Sullivan's neck. She also

18 heard the other man ask whether they needed the gun; she never saw a gun.

19       Elliott's landlord identified a receipt dated February 28, 2004, that showed a

20 balance of rent owed of $150 and a March 1, 2004, receipt that showed the remaining

21 balance for February paid, along with full rent for March and April. (Exh. 29 at 54-59.) She

22 testified that as she recalled that was the only time Elliott had ever paid rent in advance

23 and that usually she had trouble with him paying rent late.

24       Cie Anna Williams, who was Elliott's girlfriend at the time of the robbery, testified.

25 (Exh. 29 at 59-84.) She stated that the night of the robbery Elliott and James Wilson told

26 her that they planned to rob the Dollar Tree store. Elliott and Wilson had ski masks, latex

27 gloves, and a small BB gun; they had painted or colored the gun barrel to make it look

28 more realistic. Williams testified that she did not think they would actually commit a

robbery, but they returned to the apartment she and Elliott shared later that night with the store cash register key, safe key, cash, the gloves, masks, BB gun and Elliott's pocketknife. Elliott recounted the robbery to Williams, including telling her that he had held up one of the victims with his knife. She said they spent the money on their utilities and rent, bought a car for $850 and did some household shopping. Williams identified the gun at trial. (Exh. 32 at 159.)

James Wilson pleaded guilty to a lesser charge of burglary and testified against Elliott. (Exh. 29 at 84-112.) Wilson said that he and Elliott needed money, so they bought ski masks and a plastic BB gun at Walmart. He and Elliott forced their way into the Dollar Tree on the night in question as the two employees were closing. He said Elliott later told him that he had had his knife with him during the robbery. Wilson could not recall if Elliott had the BB gun with him during the robbery. Wilson thought they may have left the gun in the car or in the apartment because they did not think they needed it. Wilson identified the gun at trial. (Exh. 32 at 161.)

A Reno Police Department detective testified that three cigarette butts that appeared to have lipstick on them were recovered from the scene. (Exh. 32 at 117-121.) The detective knew from the victims that the suspects were male, therefore, when the DNA lab advised him that the DNA profile was female, he did not request any further testing.

Elliott took the stand. (Exh. 32 at 127-151.) He testified that he asked Williams to move out after he came home one day and discovered her having sex with Wilson. Elliott testified that he was employed in February 2004 and that he was able to pay his rent. He stated that he did not commit the Dollar Tree robbery. He suggested that Wilson's drug dealer may have committed the crime with Wilson. Elliott testified that he thought that Wilson and Williams were "trying to get back at" him with their testimony.

///

///

///

7

1   **IV.     PETITION**

2        **A.     Ground 8**

3        Elliott asserts that he received multiplicitous convictions, in violation of his Fifth and

4   Fourteenth Amendment rights (ECF No. 49, pp. 37-38).

5        The Fifth Amendment's Double Jeopardy Clause prohibits multiple punishments

6   for the same offense. *See* U.S. Const. amend. V. The Fifth Amendment guarantee against

7   double jeopardy is enforceable against the states through the Fourteenth Amendment.

8   *See Benton v. Maryland*, 395 U.S. 784, 794 (1969). The Double Jeopardy Clause

9   provides three related protections: (1) it prohibits a second prosecution for the same

10  offense after acquittal; (2) it prohibits a second prosecution for the same offense after

11  conviction; and (3) it prohibits multiple punishments for the same offense. *See United*

12  *States v. Wilson*, 420 U.S. 332, 343 (1975). Double jeopardy is not present if the charges

13  are different. One offense is different from another if each requires proof of a fact that the

14  other does not. *See Blockburger v. United States*, 284 U.S. 299, 304 (1932).

15       A federal court must accept a state court's interpretation of legislative intent for

16  multiple punishment purposes as the ultimate issue of double jeopardy is entitled to

17  deference under 28 U.S.C. § 2254(d). *See Missouri v. Hunter*, 459 U.S. 359, 368 (1983).

18  In Nevada, the State may charge a defendant for two separate counts of robbery for a

19  single event where there is evidence of an unlawful taking of an employer's property using

20  force or fear directed at two victims who are in joint possession and control of the stolen

21  property. *See Klein v. State*, 784 P.2d 970, 973-74 (Nev. 1989).

22       Elliott argues that he was improperly convicted of two counts of robbery for one

23  single incident, based only on the fact that two employees were present in the Dollar Tree

24  store during the robbery (ECF No. 49, pp. 37-38). The Nevada Supreme Court rejected

25  this claim on appeal:

26       First, Elliott contends that the State failed to prove that there were two
         distinct acts of robbery because "[p]ersonal property was taken only once
27       from the Dollar Tree Store." Elliott claims "[t]here was in this case only one
         act of Robbery," not two. Initially, we note that Elliott failed to object to or
28       challenge the sufficiency of the criminal information in the district court, and
         as we have repeatedly stated, failure to raise an objection with the district

court generally precludes appellate consideration of an issue. [FN1 *See Rippo v. State*, 946 P.2d 1017, 1030 (1997).] Nevertheless, our review of the issue reveals that no plain error occurred and that Elliott's contention is without merit. [FN2 *See* NRS 178.602 ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."); *Pray v. State*, 114 Nev. 455, 459, 959 P.2d 530, 532 (1998).]

We conclude that the two counts of robbery with the use of a deadly weapon were not impermissibly redundant. On appeal, Elliott concedes that there were two victims. In fact, a review of the trial transcript reveals that two store employees, a cashier and an assistant manager, were subject to force and the threat of violence by Elliott and his accomplice. This court has affirmed such convictions in the past, holding that evidence of the unlawful taking of an employer's property, by use of force or fear directed at two employees, both of whom were in joint possession and control of the property taken, supports a conviction for two separate counts of robbery. [FN3 *See Klein v. State*, 105 Nev. 880, 885, 784 P.2d 970, 973-74 (1989); *see also* NRS 200.380(1) (defining "robbery").] As such, multiple robberies may be charged where, as here, there are multiple victims involved in a single event. In such circumstances, multiple robbery convictions in a single trial do not violate the proscriptions against double jeopardy and are not impermissibly redundant. [FN4 *See, e.g., Commonwealth v. Levia*, 431 N.E.2d 928, 929-31 (Mass. 1982) (upholding multiple robbery convictions where defendant entered convenience store and forcibly obtained money from cash register operated by one employee and gas pump receipts collected by another employee); *People v. Wakeford*, 341 N.W.2d 68, 75 (Mich. 1983) (upholding multiple robbery convictions where defendant entered grocery store armed with sawed-off shotgun and took money belonging to store from two employees), called into doubt on other grounds by *People v. Baskin*, 378 N.W.2d 535 (Mich. Ct. App. 1985); *Commonwealth v. Rozplochi*, 561 A.2d 25, 28-30 (Pa. Super. Ct. 1989) (upholding multiple robbery convictions where defendant threatened two employees at financial institution and obtained money from safe). Therefore, we conclude that Elliott's contention is without merit.

(Exh. 55, pp. 2-3.)

The State charged Elliott with two counts of robbery with the use of a deadly weapon—one count each for the two victims, the two employees present at the store.

NRS § 200.381(1) defines robbery as:

the unlawful taking of personal property from the person of another, or in the person's presence, against his or her will, by means of force or violence or fear of injury, immediate or future, to his or her person or property, or the person or property of a member of his or her family, or of anyone in his or her company at the time of the robbery.

Elliott was charged with two counts because there were two separate victims. As discussed with ground 9, the State presented sufficient evidence to demonstrate that

1  each victim was the subject of a robbery, as defined by Nevada law. The jury instruction

2  essentially mirrored the statute. (Exh. 33 at 16.)

3      Elliott also argues "[a]t the very least, the state court should not have sentenced

4  [him] to consecutive time on these redundant convictions." (ECF No. 49 at 38.) The

5  statutory sentence for robbery is a minimum term of not less than 2 years and a maximum

6  term of 15 years. *See* NRS § 200.390(2). At the time Elliott committed his offense, the

7  sentence for a deadly weapon enhancement was "for a term equal to and in addition to

8  the term of imprisonment prescribed by the statute for the crime." NRS § 193.165(1)

9  (1995). The state district court judge sentenced Elliott to 72 to 180 months on both counts,

10  with equal and consecutive terms for the deadly weapon enhancement. The sentence is

11  well within the statutory parameters.

12      Elliott has failed to demonstrate that the Nevada Supreme Court's decision on

13  federal ground 8 was contrary to, or involved an unreasonable application of, clearly

14  established federal law, as determined by the U.S. Supreme Court, or was based on an

15  unreasonable determination of the facts in light of the evidence presented in the state

16  court proceeding. *See* 28 U.S.C. § 2254(d). Ground 8, therefore, is denied.

17      **B.    Ground 9**

18      Elliott argues that the prosecution presented insufficient evidence to convict Elliott

19  of two counts of robbery, in violation of his Fifth and Fourteenth Amendment rights (ECF

20  No. 49, pp. 38-39). He alleges that the State failed to prove that the two employees had

21  "joint possession and control" of the money.

22      "The Constitution prohibits the criminal conviction of any person except upon proof

23  of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 309 (1979) (citing

24  *In re Winship*, 397 U.S. 358 (1970)). On federal habeas corpus review of a judgment of

25  conviction pursuant to 28 U.S.C. § 2254, the petitioner "is entitled to habeas corpus relief

26  if it is found that upon the record evidence adduced at the trial no rational trier of fact

27  could have found proof of guilt beyond a reasonable doubt." *Id.* at 324. "[T]he standard

28  must be applied with explicit reference to the substantive elements of the criminal offense

10

1  as defined by state law." *Id.* at 324 n.16. On habeas review, this court must assume that

2  the trier of fact resolved any evidentiary conflicts in favor of the prosecution and must

3  defer to such resolution. *See id.* at 326. Generally, the credibility of witnesses is beyond

4  the scope of a review of the sufficiency of the evidence. *See Schlup v. Delo*, 513 U.S.

5  298, 330 (1995).

6        Grounds 8 and 9 are essentially intertwined. As set forth above in the discussion

7  of ground 8, the Nevada Supreme Court disagreed that the State presented insufficient

8  evidence. (Exh. 55, pp. 2-3.) Particularly considering the testimony of the two store

9  employees and Elliott's girlfriend, the State presented sufficient evidence to convict Elliott

10  of two counts of robbery with a deadly weapon. Elliott has not shown that the Nevada

11  Supreme Court's decision on federal ground 9 was contrary to, or involved an

12  unreasonable application of, clearly established federal law, as determined by the U.S.

13  Supreme Court, or was based on an unreasonable determination of the facts in light of

14  the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Ground 9,

15  therefore, is denied.

16        **C.**    **Procedurally Defaulted Claims**

17        The court previously held that grounds Grounds 1, 2, 3, 4, 5(A), and 11 were all

18  procedurally defaulted in state court but deferred the determination as to whether Elliott

19  could show actual prejudice to this merits adjudication.

20        "Procedural default" refers to the situation where a petitioner in fact presented a

21  claim to the state courts, but the state courts disposed of the claim on procedural grounds,

22  instead of on the merits. A federal court will not review a claim for habeas corpus relief if

23  the decision of the state court regarding that claim rested on a state law ground that is

24  independent of the federal question and adequate to support the judgment. *See Coleman*

25  *v. Thompson*, 501 U.S. 722, 730-31 (1991). The *Coleman* Court explained the effect of a

26  procedural default:

27          In all cases in which a state prisoner has defaulted his federal claims in state
        court pursuant to an independent and adequate state procedural rule,
28          federal habeas review of the claims is barred unless the prisoner can
        demonstrate cause for the default and actual prejudice as a result of the

alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman*, 501 U.S. at 750; *see also Murray v. Carrier*, 477 U.S. 478, 485 (1986).

The court previously determined that Elliott demonstrated good cause as to the procedural default of grounds 1, 2, 3, 4, 5(A), 7 and 11. (ECF No. 74, p. 13.) Elliott asserts that he can demonstrate actual prejudice to excuse the procedural default.

### 1.    Ground 1

Elliott alleges that his trial counsel represented him despite an actual conflict of interest, in violation of Elliott's Fifth, Sixth, and Fourteenth Amendment rights. (ECF No. 49, pp. 21-23.) Specifically, he argues that his trial counsel Kevin Van Ry had a conflict of interest based on Elliott's alleged connections to a pending lawsuit against Van Ry's law firm, the Alian group. (ECF No. 49 at 21-23.)

The Sixth Amendment right to counsel encompasses a right to representation free from conflicts of interest. *See Lewis v. Mayle*, 391 F.3d 989, 995 (9th Cir.2004). To establish a violation of the right to conflict-free counsel, the petitioner must show either that (1) despite an objection, the trial court failed to allow him the "opportunity to show that potential conflicts impermissibly imperil his right to a fair trial;" or (2) that an actual conflict of interest existed. *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980); *Alberni v. McDaniel*, 458 F.3d 860, 869-870.

In several cases in which the United States Supreme Court has defined the right to conflict-free counsel, the defense attorney actively and concurrently represented conflicting interests. *See Mickens v. Taylor*, 535 U.S. 162, 166-167 (2002) (discussing earlier authority); *see also Holloway v. Arkansas*, 435 U.S. 475 (1978) (attorney representing co-defendants); *Cuyler*, 446 U.S. at 337-38 (same). In those cases, the Court created, in effect, a distinction between an actual conflict of interest, and a mere hypothetical one. Indeed, in *Mickens*, the Court held that "actual conflict" is defined by the effect a potential conflict had on counsel's performance, explaining that: "an actual conflict of interest [means] precisely a conflict that affected counsel's performance-as opposed to

12

1   a mere theoretical division of loyalties." *Id.* at 171; 172 n. 5 ("[W]e have used 'conflict of

2   interest' to mean a division of loyalties that affected counsel's performance.").

3          With respect to a breakdown in the attorney-client relationship, the Supreme Court

4   has made it clear that the Sixth Amendment guarantee of counsel does not guarantee a

5   meaningful attorney-client relationship. *See Morris v. Slappy*, 461 U.S. 1, 14 (1983). The

6   Ninth Circuit has noted that if a conflict is of an indigent defendant's own making, that is

7   if he or she sabotaged the attorney-client relationship or failed to make reasonable efforts

8   to develop the relationship, he may still have "received what the Sixth Amendment

9   required in the case of an indigent defendant." *Schell v. Witek*, 218 F.3d 1017 (9th Cir.

10  2000).

11         At the outset of the trial for the Smith's grocery store robbery, which overlapped

12  with the Dollar Tree case, *see* n.3, Elliott informed the court that he had a conflict of

13  interest with Van Ry. (Pet. Exh. 19a at 3-24.) He told the court that a lawsuit had been

14  filed against the law firm where Van Ry worked, the Jack Alian conflict group, and that he

15  was trying to join the lawsuit. The court asked him if he was a named plaintiff; he

16  responded that he was a John Doe. Elliott told the court that Jack Alian had withdrawn

17  from representing Elliott in this case due to the lawsuit, but the prosecutor and defense

18  counsel clarified for the court that actually Van Ry took the Smith case because he already

19  represented Elliott on the Dollar Tree case and not because any conflict existed. The

20  court asked Van Ry if he saw any conflict of interest, and he denied any conflict existed.

21  The court pressed Elliott about the civil lawsuit, and Elliott said that he is a John Doe but

22  would be added as a named plaintiff but "it's on hold at the moment because I believe

23  there's some federal rulings that are coming down. . . . there's going to be a separate

24  lawsuit naming each defendant. That's been the hold-up right now." (Pet. Exh. 19a at 9.)

25  Elliott then raised a series of other complaints about Van Ry, including related to a

26  competency evaluation and to global plea negotiations. In response to the judge's

27  question, Van Ry stated that he was prepared to go to trial. The court then concluded "I

28  do not see any conflict of interest. I see the counsel attempting to negotiate a settlement

13

of both of those cases. As you said, global. It didn't work. You have the right to reject it. You have a right to go to trial today. We've got a jury waiting. And your motion to appoint new counsel is denied." (*Id.* at 14-15.)

Elliott alleged that he was attempting to join a lawsuit against the Alian group. In his federal petition, he explained that the federal lawsuit argued that the financial arrangement between the Alian group and the county, which paid a flat fee for services, discouraged the group from hiring investigators or experts. (ECF No. 49 at 21.) Van Ry told the court during the discussion of the potential conflict that he did not know much about the lawsuit. Elliott was not a party to the suit. (*Id.* at 23) Moreover, Elliott never raised any of these concerns in the case at issue in this petition—the Dollar Tree case. Elliott has not demonstrated that an actual conflict of interest existed, and therefore, he cannot demonstrate that he suffered prejudice due to a conflict. Ground 1 is dismissed as procedurally barred.

**2.     Ground 2**

Elliott argues that he and Van Ry had a complete breakdown in the attorney-client relationship, and therefore his continuation as Elliott's attorney was in violation of his Fifth, Sixth, and Fourteenth Amendment rights. (ECF No. 49 at 24-26.)

State district court Judge Steven R. Kosach continued the trial at a December 2004 hearing where prosecutors and defense counsel informed the judge that there was a possibility that the parties would negotiate a settlement of both this case and the Smith's case. (Exh. 11.) Elliott expressed frustration and explained that he did not want a global settlement because he was innocent of the Dollar Tree robbery. The judge continued the case so that Elliott and Van Ry could consider the situation and prepare (whether for trial or not). Elliott sent Judge Kosach an inmate request form in January 2005 complaining that Van Ry had still not met with him. (Exh. 13.)

At a March 2005 hearing the defense told the court that they were still exploring a negotiation on both cases and specifically that Elliott had indicated a willingness to take

1    a deal. (Exh. 19 at 3.) The case ultimately proceeded to trial before Judge Charles M.

2    McGee. (Exh. 29.)

3            The Court notes that in denying Elliott's state habeas petition on the Smith's

4    case, the district court found:

5            Petitioner asserts a claim of abuse of discretion by this Court in that this
        Court did not appoint new counsel to Petitioner. This ground is based upon
6        apparent assertions made to this Court regarding dissatisfaction with his
        counsel. However, this ground is belied by the record. Petitioner made a
7        motion for new counsel in a concurrent pending case before this Court with
        the same appointed counsel, Van Ry. However, Petitioner never made a
8        formal request or filed any motions for the appointment of new counsel in
        this case.
9
            Petitioner argues that if he is appointed the same attorney in two
10       separate pending cases and makes a motion for appointment for new
        counsel due to his dissatisfaction with counsel's performance in one case,
11       then it reasons that if he is dissatisfied by this same counsel in one case,
        then he is dissatisfied with counsel in all cases. Although Petitioner failed to
12       file any motions for new counsel in this case, this Court did in fact inquire
        into the alleged breakdown in the attorney-client relationship and potential
13       need for new counsel in this case. After a thorough canvass, this Court
        found that no such breakdown of the attorney-client relationship existed.
14       Petitioner expressed to the Court his dissatisfaction with counsel in that he
        had no confidence or trust in his counsel, but that he could not articulate a
15       specific reason for this dissatisfaction and did not have good cause for his
        mistrust.
16

17   (Exh. 77 at 3.)

18           Elliott baldly alleges that Van Ry's "sole interest" was to pressure Elliott into a

19   global plea deal. (ECF No. 49 at 26.) Notably, Van Ry had negotiated a plea deal wherein

20   the Dollar Tree case would have been dismissed and Elliott would not have been required

21   to admit guilt. (Pet. Exh. 13 at 3-4.) Elliott elected to go to trial. While Elliott did complain

22   at times prior to trial that Van Ry was not in sufficient communication with him, the trial

23   record does not reflect a complete breakdown of the attorney-client relationship.[5] Elliott

24   cannot show prejudice. Ground 2 is therefore dismissed as procedurally barred.

25   ///

26   ///

27

28           [5]*See also* discussion of ground 5(A), *infra*, including Van Ry's description of plea
     negotiations and trial preparation.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 3.   Ground 3

Elliott asserts in ground 3 that the state court improperly denied his request to proceed pro se in violation of his Sixth and Fourteenth Amendment rights. (ECF No. 49 at 26-27.)

The Sixth Amendment guarantees a defendant the right to elect to represent himself. *See Faretta v. California*, 422 U.S. 806 (1975). However, to invoke the right to self-representation, the defendant's request must be clear and unequivocal. *See id.* at 835; *see also U.S. v. Schaff*, 948 F.2d 501, 503 (9th Cir. 1991).

Elliott requested to represent himself in the Smith's case, the court conducted a *Faretta* hearing, and denied Elliott's request. (Pet. Exh. 19a at 17-24.) At the September 2005 hearing to confirm the trial date for the Dollar Tree case, Elliott did not request to represent himself. (Exh. 24.) He did say: "my motions that I've put in on [in the Smith's case,] just asking to dismiss Mr. Van Ry and the conflicts I've had there, I'd like to put that on the record it's also pertaining to this case as well." (*Id.* at 4.) Respondents state that it does not appear that the motions were made a part of the Dollar Tree record, which appears to be correct. The state-court record for the Dollar Tree case does not reflect that Elliott ever made a clear and unequivocal request to represent himself. Elliott has not demonstrated that ground 3 has merit or that he suffered prejudice. Ground 3 is dismissed as procedurally barred.

### 4.   Ground 5(A)

Elliott contends that state district court judge Steven Kosach had an intolerable risk of bias because the court repeatedly rebuffed Elliott's complaints about Van Ry and "vouched" for Van Ry as his former law clerk. (ECF No. 49 at 31-33.)

Most matters relating to judicial disqualification do not rise to a constitutional level. *See FTC v. Cement Institute*, 333 U.S. 683, 702 (1948) (citing *Tumey v. Ohio*, 273 U.S. 510, 523 (1927)). The Supreme Court has declined to imply bias that requires disqualification where (1) the basis for establishing the judge's alleged interest in the case is merely speculative; or (2) the basis for establishing the judge's alleged interest in the

case would apply to all judges. *See Bracy v. Gamley*, 520 U.S. 899, 909 (1997) (rejecting claim of implied bias as speculative but permitting discovery to give petitioner an opportunity to establish actual bias). Judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. *See Liteky v. United States*, 510 U.S. 540, 555 (1994). Almost invariably, such rulings may serve as proper grounds for appeal but not recusal. *See id.* "[E]xpressions of impatience, dissatisfaction, annoyance, and even anger" do not establish actual bias. *Id.* at 555-56.

First, Elliott never raised any concerns in the Dollar Tree case that his counsel was Judge Kosach's former law clerk. All the exchanges that Elliott cites in support of this claim occurred in the Smith's case. (ECF No. 49 at 32-33.)

Second, in a hearing on the Smith's case, Van Ry told Judge Kosach that he had met at length with Elliott and that he had thought Elliott wanted to accept the plea deal wherein the Dollar Tree case would be dismissed and the State would not seek habitual criminal treatment, but that now at the hearing Elliott had indicated to Van Ry he was not ready to enter a plea. (Pet. Exh. 13.) Judge Kosach addressed Elliott:

> THE COURT: Is it because I yelled at you the other day?
>
> THE DEFENDANT: No, sir.
>
> THE COURT: Okay. That's fine. Is it because I raised your bail the other day?
>
> THE DEFENDANT: No, sir.
>
> THE COURT: Okay. That's fine. Now, I think that you need to clear your head and face what is facing you objectively and honestly what is happening to you right this second with these other charges. . . . You've got a good attorney. Used to be my law clerk. Did you know that?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: That's probably why I was pissed at you the other day because you dissed him as far as I was concerned. But that's neither here nor there. He's representing you to the best of your ability. Listen to what he has to say.

(*Id.* at 4-5.) At the next hearing, Van Ry informed the court:

> I went up to the jail yesterday and I spent approximately 45 minutes to an hour yesterday answering some of his questions and trying to cover some

1
2
> of his concerns. I have to admit that at this time I still haven't been able to, in my opinion, get him to think in his best interests. He's not going to take any deals at this point.

3 (Pet. Exh. 14 at 3-4.) Elliott never addressed the court.

4     At the hearing to confirm the trial date, Elliott asked the court to set a hearing to

5 dismiss Van Ry. (Exh. 16.) Judge Kosach told Elliott that no motion had been filed. Elliott

6 gave the court the motion, which the court said would be filed. Van Ry said he had not

7 seen the motion; he indicated that he was ready to go to trial. The prosecutor stated that

8 he would oppose any continuance.

9     Elliott went to trial in both cases. As stated above, Judge Kosach did not preside

10 over the Dollar Tree trial. In the Smith's case the jury found Elliott guilty of one count of

11 robbery of a person 60 years of age or older and one count of robbery with the use of a

12 deadly weapon; in the Dollar Tree case the jury convicted him of two counts of robbery

13 with use of a deadly weapon. (Exhs. 34, 35, 40.) Judge Kosach presided over the

14 sentencing for the two cases and sentenced Elliott on the Smith's case to two terms of 72

15 to 180 months for counts I and II, with an equal and consecutive term for the age

16 enhancement for each count. (Exh. 40.) On the Dollar Tree case the court sentenced

17 Elliott to two terms of 72 to 180 months for counts I and II, with an equal and consecutive

18 term for the deadly weapon enhancement for each count, to run consecutive to the

19 Smith's case.

20     The state-court record reflects that Judge Kosach mentioned that Van Ry was a

21 competent attorney and a past law clerk. He also questioned Van Ry and Elliott about the

22 alleged conflict and Elliott's request for new counsel and concluded that new counsel was

23 not warranted. Judge Kosach did not preside over trial. Elliott was found guilty of two

24 violent robberies. Judge Kosach sentenced Elliott in accordance with the prosecutor's

25 recommendation.[6]  The record does not demonstrate a risk of bias by the judge;

26

27
28
---
[6]NRS § 200.390(2) prescribes that the sentence for robbery is a minimum of two years and a maximum term of 15 years. At the time Elliott committed the offense, the sentence for a deadly weapon enhancement was "for a term equal to and in addition to the term of imprisonment prescribed by the statute for the crime." NRS § 193.165(1)(1995).

1   accordingly, Elliott cannot have suffered prejudice. Ground 5(A) is dismissed as

2   procedurally barred.

3                       **5.      Ground 11**

4          Elliott argues that the conflict of interest that amounted to a complete breakdown

5   in the attorney-client relationship between he and Van Ry extended through the direct

6   appeal proceedings. (ECF No. 49 at 40-41.)

7          To the extent that this ground is duplicative of ground 2, it is denied. With respect

8   to the direct appeal, at the conclusion of the sentencing hearing, Van Ry informed the

9   court that another attorney, Carter King wanted to represent Van Ry on appeal. (Exh. 40

10  at 16-19.) Van Ry stated that he was prepared to proceed with the appeal, but he asked

11  to withdraw as counsel of record so that King could litigate the appeal. In response to the

12  court's questioning, Elliott indicated that he had not retained King. The court told the

13  defense and prosecutors to meet and figure out who was going to file the appeal. The

14  court entered an order allowing Van Ry to withdraw but did not appoint new counsel.

15  (Exh. 42.) Elliott did not retain new counsel, and no attorney appeared as his counsel.

16  Therefore, Van Ry prepared the notice of appeal and case appeal statement for Elliott to

17  file pro per. Elliott signed the notice of appeal and directed Van Ry to file it on his behalf.

18  (Exhs. 23, 43, 44.)

19         Van Ry raised the two issues on appeal that Elliott discussed at sentencing: (1)

20  "Whether there was sufficient evidence presented to establish the elements of Robbery

21  with The Use Of A Deadly Weapon;" and (2) "Whether there was sufficient evidence

22  presented to establish that Two 'acts of Robbery' occurred." (Exh. 40 at 12; Exh. 53.)

23  Elliott has failed to identify any other issues that he wanted raised on appeal. (ECF No.

24  49 at 40-41.) This claim lacks merit, and Elliott cannot demonstrate prejudice. Ground 11

25  is therefore dismissed as procedurally barred.

26                 **D.    Procedurally Defaulted Claims of Ineffective Assistance of Counsel**

27         Grounds 4, 6, 7, and 10 are procedurally defaulted and assert ineffective

28  assistance of counsel claims.

                                        19

### 1.   Ground 4

In this defaulted claim, Elliott contends that Van Ry was ineffective for failing to introduce exculpatory evidence, namely, alibi witnesses and evidence that Elliott had a job and other sources of financial support, and for failing to seek DNA testing of cigarette butts police collected from near the Dollar Tree store. (ECF No. 49 at 27-31.)

Elliott's postconviction counsel raised the specter of alibi witnesses in Elliott's state postconviction proceedings. (Exh. 84.) The hearing on the state petition reflects that two of the potential witnesses could not provide an alibi for the day of the robbery and a third proposed witness was not named in the state habeas petition, nor had investigators had success in contacting him. (*Id.* at 7-8.) As set forth above, Elliott testified at trial that he was employed at the time of the robbery and about other sources of financial support. Also as discussed above, a police officer testified at trial that he arranged for DNA testing of the cigarette butts but declined further testing after it was determined that the lipstick-stained cigarette butts revealed a female DNA profile. The victims had indicated that the perpetrators were two men.

Van Ry was not deficient for not calling witnesses who could not have provided an alibi or not having further DNA testing of the cigarettes completed. Elliott certainly cannot show he was prejudiced. He cannot overcome default of ground 4, and it is dismissed as procedurally barred.

### 2.   Ground 7

Elliott alleges that Van Ry provided ineffective assistance when he failed to seek suppression of the BB gun. (ECF No. 49 at 36-37.) Elliott argues that a suppression motion may have succeeded, because police searched Elliott's apartment pursuant to a warrant based on another crime, and it is unclear exactly when police received information about Elliott's potential involvement in this case.

A warrant authorizing a search of a home provides an officer authority to search any "open closets, chests, drawers, and containers" if the container may contain an item specified in the warrant. *United States v. Ross*, 456 U.S. 798, 821 (1982). Seizure of

objects not specified in a search warrant is proper if: (1) the initial intrusion of the police is lawful; (2) the police "inadvertently" discover the evidence; and (3) "it must be 'immediately apparent' to the police that the items they observe may be evidence of a crime." *Luster v. State*, 991 P.2d 466, 468 (Nev. 1999) (citing *Coolidge v. New Hampshire*, 403 U.S. 443 (1971)).

Elliott fails to show that had Van Ry filed the motion to suppress, there was a substantial likelihood of a different outcome at trial. Elliott's girlfriend testified that the BB gun belonged to Wilson, and Wilson testified that there was no plan to use the BB gun in the robbery. More importantly, the prosecution did not argue that the BB gun was used in the robbery. Elliott was convicted of robbery with a deadly weapon for the use of a knife. Elliott has not demonstrated prejudice, and ground 7 is dismissed as procedurally barred.

### 3.   Grounds 6 and 10

These two IAC claims are procedurally defaulted, and the Court deferred a decision regarding whether Elliott can overcome default until the consideration of the merits of the petition. (ECF No. 74.) In *Martinez v. Ryan*, the United States Supreme Court held that ineffective assistance of postconviction counsel may establish cause to overcome procedural default. *See* 566 U.S. 1, 17 (2012). Under *Martinez*, a federal district court may consider whether state postconviction counsel was ineffective in failing to raise a claim of ineffective assistance of trial counsel and whether the underlying trial IAC claim is substantial. *See id.* at 18.

In Ground 6, Elliott argues that trial counsel Van Ry was ineffective for failing to seek the recusal of state district judge Steven Kosach based on the judge's relationship with Van Ry and his expressions of bias against Elliott. (ECF No. 49 at 34-35.) As discussed above, the state-court transcripts reflect that Judge Kosach, while observing that Van Ry was a competent attorney, noted that Van Ry had served as his law clerk. (Pet. Exh. 13 at 5.) For the reasons discussed at length in relation to ground 5(A), this IAC claim is not substantial. Elliott cannot demonstrate prejudice, and ground 6 is dismissed as procedurally barred.

1    In Ground 10, Elliott alleges that Van Ry was ineffective because he failed to

2    litigate issues regarding the alleged multiple convictions Elliott received for a single

3    robbery. (ECF No. 49 at 39-40.) As discussed above with respect to grounds 8 and 9, the

4    underlying substantive claim lacks merit. Thus, Elliott cannot demonstrate that Van Ry

5    was ineffective for failing to raise this issue at trial or that he suffered prejudice. This IAC

6    claim is not substantial. Ground 10 is dismissed as procedurally barred.

7    In summary, grounds 8 and 9 are denied on the merits, and grounds 1, 2, 3, 4,

8    5(A), 6, 7, 10, and 11 are dismissed as procedurally barred. Thus, the Petition is denied

9    in its entirety.

10   ## V.   CERTIFICATE OF APPEALABILITY

11   This is a final order adverse to the petitioner. As such, Rule 11 of the Rules

12   Governing Section 2254 Cases requires this court to issue or deny a certificate of

13   appealability (COA). Accordingly, the court has *sua sponte* evaluated the claims within

14   the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v.*

15   *Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

16   Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner

17   "has made a substantial showing of the denial of a constitutional right." With respect to

18   claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would

19   find the district court's assessment of the constitutional claims debatable or wrong." *Slack*

20   *v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4

21   (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate

22   (1) whether the petition states a valid claim of the denial of a constitutional right and (2)

23   whether the court's procedural ruling was correct. *See id.*

24   Having reviewed its determinations and rulings in adjudicating Elliott's petition, the

25   Court finds that reasonable jurists would not find its determination of any grounds to be

26   debatable pursuant to S*lack*. The Court therefore declines to issue a certificate of

27   appealability.

28   ///

22

1   VI.   **CONCLUSION**

2   It is therefore ordered that the amended petition (ECF No. 49) is denied.

3   It is further ordered that a certificate of appealability is denied.

4   The Clerk of Court is directed to enter judgment accordingly and close this case.

5   DATED THIS 14th Day of September 2021.

6

7

8   MIRANDA M. DU
    CHIEF UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28